**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| AMBER MULLIS, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| | 5:22-cv-00388 |
| WESLEY GLEN MINISTRIES, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

<u>**COMPLAINT**</u>

COMES NOW, Plaintiff Amber Mullis, and brings this action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*   Plaintiff alleges that Defendant Wesley Glen Ministries, Inc. subjected Plaintiff to discrimination based on sex and disability, including through its failure to provide a reasonable accommodation and improper medical inquires and examination, that Defendant failed to compensate Plaintiff at the appropriate rate of overtime, and that Defendant further interfered with Plaintiff's right to leave under the Family and Medical Leave Act, respectfully showing the Court as follows:

**JURISDICTION AND VENUE**

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of the Americans with Disabilities Act,

Title VII of the Civil Rights Act, the Fair Labor Standards Act, and the Family and Medical Leave Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Macon, Bibb County, Georgia, which is located within this judicial district.

<strong>PARTIES</strong>

3.

Plaintiff Amber Mullis (hereinafter, "Plaintiff" or "Mullis") is a citizen of the United States and a resident of Georgia.   At all times relevant to this suit, Ms. Mullis was employed with Defendant Wesley Glen Ministries, Inc.

4.

At all relevant times, Ms. Mullis was considered a covered, non-exempt employee under all laws referenced herein.

5.

Defendant Wesley Glen Ministries, Inc. (hereinafter, "Defendant") is a domestic nonprofit corporation, incorporated under the laws of the State of Georgia.   Defendant's principal office is located at 4580 North Mumford Road, Macon, Bibb County, Georgia 31210.   Defendant may be served with process through its Registered Agent, Cameron Thomas Bishop, located at 4580 North Mumford Road, Macon, Bibb County, Georgia 31210.

6.

Defendant has employed in excess of 50 employees, working for at least 20 calendar weeks, in 2020 and preceding years.  Defendant does business in excess of $500,000.00 on an annual basis, and Defendant's employees' work regularly involves them in interstate commerce.

7.

Defendant is a covered employer within the meaning of the Americans with Disabilities Act and Title VII of the Civil Rights Act.

8.

Defendant is also a covered employer under the Rehabilitation Act because Defendant receives federal grants of assistance and otherwise has contracts with the federal government, including at least one loan from the Paycheck Protection Program.

9.

Defendant is a covered enterprise under the Fair Labor Standards Act.

10.

While Plaintiff is a registered nurse (hereafter, "RN"), she was employed as Defendant's Director of Health and Wellness.  In this role, the majority of Plaintiff's duties included processing and completing routine, non-medical documentation that did not require Plaintiff to use her training as a RN.  An additional and significant amount of time, while not the majority, included providing training to Defendant's staff and filing reports concerning such training.  Additionally, a small portion of Plaintiff's time was devoted to traveling to Defendant's various facilities throughout the Middle Georgia region to ensure they were operating appropriately and had the materials and supplies they needed.  As a result, the vast majority of Plaintiff's time did not require the use of her advanced knowledge in the field of medicine or science.  Moreover, Plaintiff's

primary duties did not require the exercise of her discretion and independent judgment with respect to matters of significance to Defendant's operations.  Accordingly, Plaintiff was a covered, non-exempt employee under the Fair Labor Standards Act.

11.

At all relevant times to this action, Plaintiff had worked for Defendant for at least twelve months, she worked for at least 1,250 hours during the twelve months preceding her leave, and she worked at a location where Defendant had at least 50 employees within a 75-mile area.  As a result, Defendant is a covered employer under the Family and Medical Leave Act, and Plaintiff was an eligible employee under the same.

## STATEMENT OF FACTS

12.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 11, as if the same were set forth herein.

13.

Most recently, Ms. Mullis was employed with Defendant for nearly one year, from May 15, 2019 until May 3, 2020, at Defendant's primary place of business in Macon-Bibb County.

14.

Previously, from around 2015 until 2017, Ms. Mullis was employed with Defendant as a Nutritionist.

15.

Defendant is a private, not for profit agency associated with the United Methodist Church, providing housing and care for adults with intellectual and developmental disabilities.

16.

During the time in which Ms. Mullis, who is female, served as Defendant's Director of Health and Wellness, her performance was exemplary.

17.

Ms. Mullis was responsible for training Defendant's employees and for overseeing the medical care of the residents.

18.

Ms. Mullis' position required her to travel frequently to Defendant's many residential houses located throughout the area.

19.

Ms. Mullis' duties also required her to work closely with Director of Human Resources Jeannie McKenzie (hereinafter, "HR Director McKenzie"), who is female, and both individuals reported directly to the Defendant's former Chief Executive Officer Tyler Plaxico (hereinafter, "CEO Plaxico"), who was male.

20.

Ms. Mullis' job often required her to work late nights, early mornings, weekends, and far in excess of 40 hours in any given workweek.

21.

However, when Ms. Mullis inquired into her eligibility for overtime pay, Defendant erroneously advised Ms. Mullis that she was exempt from the Fair Labor Standards Act's overtime requirements because she was paid on a salaried basis.

22.

As a result, Ms. Mullis did not receive compensation at the appropriate rate of overtime for

any of her work that exceeded 40 hours in any given workweek.

<u>Discrimination Based on Sex</u>

23.

In or around August 2019, CEO Plaxico found out that Ms. Mullis was living with her fiancé, a member of the opposite sex to whom Ms. Mullis was engaged but not married.

24.

Upon learning this information, CEO Plaxico threatened to terminate Ms. Mullis' employment because she was residing with a member of the opposite sex for whom she was not married.

25.

In making such a threat, CEO Plaxico cited Defendant's ethics policy, even though such policy expressly applied to Defendant's ministerial staff, and not to a non-ministerial position like that held by Ms. Mullis.

26.

Despite CEO Plaxico's threat, Ms. Mullis was able to continue working.

27.

However, at some point thereafter, Ms. Mullis broke off her engagement with her fiancé.

28.

During her relationship, Ms. Mullis and her fiancé would routinely use the "Track My iPhone" application to ascertain one another's location.

29.

Shortly after her breakup, in around late January 2020, Ms. Mullis happened to check the app, and she found that her former fiancé was in close proximity to Defendant's primary office.

Ms. Mullis then speculated, out loud, that her ex-fiancé may have been in the area to see if Ms. Mullis was with another man.

30.

CEO Plaxico heard Ms. Mullis' remark, and he told Ms. Mullis that he was concerned because Ms. Mullis was putting everyone else's safety at risk.

31.

Ms. Mullis' former fiancé had not said anything or taken any actions that should have caused any other person associated with Defendant to be concerned for their safety.

32.

To that point, Ms. Mullis had also not said or done anything that should have caused Defendant's employees or residents to be concerned for their safety.

33.

Still, based solely on his knowledge that Ms. Mullis had ended her relationship the man and that he was apparently in North Macon, CEO Plaxico immediately sent Ms. Mullis home for a two-day suspension.

34.

When Ms. Mullis returned to work following her suspension, CEO Plaxico demanded that Ms. Mullis advise him if she had any future contact with her former fiancé.

<u>Events Concerning Disability and Medical Condition</u>

35.

In or around early February 2020, after Ms. Mullis returned from her suspension, CEO Plaxico Ms. Mullis to meet with him and HR Director McKenzie.

36.

During this February 7, 2020 meeting, CEO Plaxico told Ms. Mullis that she "needed" therapy, and CEO Plaxico even recommended that Ms. Mullis should see one specific mental health professional in the Macon area.

37.

When Ms. Mullis asked what caused him to make this statement, CEO Plaxico merely responded that Ms. Mullis had a lot on her plate at the that time.

38.

There was nothing else about Ms. Mullis' performance and conduct that suggested that she needed counseling, and Ms. Mullis respectfully declined CEO Plaxico's suggestion.

39.

CEO Plaxico brought up the purported need for counseling several more times to Ms. Mullis over the course of the following days, and CEO Plaxico even told Ms. Mullis to pay for the mental health treatment with Defendant's company credit card.

40.

As a result of these conversations with the CEO, Ms. Mullis began to believe that Defendant was *requiring* her to go to counseling and that her job was in jeopardy if she declined.

41.

Ms. Mullis made her first therapy appointment for February 18, 2020.

42.

Despite being relatively young, Ms. Mullis has a history of cancer. Specifically, she suffers from Osteosarcoma, which is found in bone and, potentially, in soft connective tissue.  This condition causes swelling near bones, bone and joint pain, limited movement, anemia, fever,

exhaustion, unexplained weight loss, and a propensity for bones to be easily broken or injured. Osteosarcoma can result in very serious complications.

43.

Osteosarcoma impacts Ms. Mullis' major life activities, including her mobility and ability to walk, and the condition and treatment at times impedes Ms. Mullis' ability to work. As a result, Osteosarcoma is considered a disability under the Americans with Disabilities Act and Rehabilitation Act.

44.

Defendant was aware of Ms. Mullis' condition before she was hired.

45.

Specifically, when Ms. Mullis was rehired, she informed Defendant that, while not guaranteed, there was a possibility that she may have appointments and surgeries that would cause her to be absent from work from time-to-time.

46.

Unfortunately, as Ms. Mullis neared her anniversary in her position of Director of Health and Wellness, her symptoms of Osteosarcoma returned. After several appointments with specialists in April 2020, doctors discovered a mass at the base of Ms. Mullis' skull. He doctors believed that the mass could be Polycythemia, and she was referred to an oncologist to rule out that diagnosis.

47.

Ms. Mullis informed the CEO Plaxico and HR Director McKenzie of her oncology appointment, which would require her to miss a partial day of work. Subsequently, CEO Plaxico advised Ms. Mullis that he would like to meet with her and HR Director McKenzie after the

appointment, as he wanted to know what was going on with Ms. Mullis' health.

48.

Ms. Mullis went to her April 28, 2020, appointment with the oncologist, returned to work just after noon, and met with the CEO and HR.  She explained that her doctor had ordered an MRI on her brain, which was scheduled for May 4, 2020.  She explained that her doctors were not quite sure what was going on, but they hoped to find out through genetic testing and her records from her prior treatment.

49.

In response, CEO Plaxico asked Ms. Mullis a number of probing questions about her condition.

50.

CEO Plaxico asked Ms. Mullis if she was going to be able to work during all of the testing.  Ms. Mullis explained that there would be minimal disruption to her work and that, even if she were unable to come in for any reason, she would be able to complete her work remotely and remain available.

51.

CEO Plaxico then asked Ms. Mullis that, if she were required to undergo chemotherapy or radiation, what kind of timeline she expected with this treatment.  Ms. Mullis did not know the answer.  In response, CEO Plaxico then told Ms. Mullis she was not answering his question, and then bluntly asked, "will you be able to work?  Yes or no?"  Once again, Ms. Mullis stated that, as far as she knew, she could work.

52.

CEO Plaxico continued questioning Ms. Mullis, asking what symptoms she was

experiencing because of the Polycythemia, the mass found at the base of her skull.  Ms. Mullis explained that it caused migraines, changes in her mood and unusual reactions to situations, and problems with her vision. Ms. Mullis further explained how painful the migraines were and that she had no intention of exhibiting any inappropriate behavior.

53.

At some point during this April 2020 meeting, CEO Plaxico advised Ms. Mullis to send a text message to all members of Defendant's administrative staff, to explain, not only that she would be absent, but also the specific details about her health concerns and the testing and treatment that she was receiving.

54.

CEO Plaxico finally ended his interrogation of Ms. Mullis.  He confirmed that Defendant would work with Ms. Mullis and keep her condition in mind.  The conversation ended and Ms. Mullis returned to work.

55.

The apparent reason that CEO Plaxico apparently asked such probing questions during the April 28, 2020 meeting were the result of his concern about Defendant's operations during any periods of leave that Ms. Mullis would have to take due to her condition.

56.

The following day, April 29, 2020, Ms. Mullis was traveling to several of Defendant's homes in order to ensure that each location was following proper protocols for COVID-19.  Neither CEO Plaxico HR Director McKenzie were on-site that morning, which required Ms. Mullis to be the individual to pick up a delivery of personal protective equipment ("PPE") provided by the Georgia Department of Public Health.

57.

Meanwhile, the Home Manager of one of Defendant's facilities called Ms. Mullis to advise her that the Facility Manager was not following COVID-19 protocols, such as waiting to have his temperature taken before entering a home and wearing a mask when interacting with residents. During this call, Ms. Mullis misheard the Home Manager, and thought he said that the Facility Manager had a fever of 102 degrees (she apparently said 100.2).

58.

Based on her misunderstanding of what se had been told, it was Ms. Mullis' belief that the Facility Manager was experiencing symptoms consistent with COVID-109 infection while he was still working in one of Defendant's facilities.

59.

As a result, Ms. Mullis immediately called CEO Plaxico over the Bluetooth speaker in her vehicle.  Because Ms. Mullis was not the supervisor of the Facility Manager and the two were on the same level of management, and due to the severity of the situation in light of the COVID-19 pandemic, she felt that the CEO needed to be the one to address the situation.  Ms. Mullis may have been speaking louder than usual since she was in her vehicle and it was raining heavily, but her tone was polite and professional.  However, CEO Plaxico interrupted and told Ms. Mullis to stop yelling, that she was overreacting, and she was acting unprofessionally.  When Ms. Mullis tried to explain that she was not intending to yell, CEO Plaxico cut her off and abruptly hung up the phone.

60.

CEO Plaxico immediately sent several texts messages to Ms. Mullis, one of which stated that he was "trying to be tolerant of [Ms. Mullis'] situation."

61.

CEO Plaxico clearly connected his interpretation of Ms. Mullis' tone during the call to her explanation during the prior day's meeting of how the brain mass and migraines had the potential to affect her mood.

62.

CEO Plaxico and HR Director McKenzie met with Ms. Mullis the next day, April 30, 2020.

63.

Apparently, the original purpose of the meeting was so that Defendant could issue a written reprimand and/or a two-day suspension with pay to Ms. Mullis.

64.

Ms. Mullis' osteosarcoma and/or brain mass often caused Ms. Mullis to struggle with her memory, particularly during times that were particularly emotional.  For this reason, Ms. Mullis frequently used a recording device to document meetings and events.

65.

Notwithstanding the memory concerns, Ms. Mullis did not feel that the actions that Defendant was proposing during this meeting were proper or fair, and as a result, she recorded the April 30, 2020 meeting with her cell phone, which she had placed screen-down on the table.

66.

CEO Plaxico wanted Ms. Mullis to sign for receipt of the written reprimand, but Ms. Mullis was so upset and emotional that she was unable to grasp the pen to sign her name.

67.

CEO Plaxico continued to talk, accusing Ms. Mullis of overreacting and calling her a liar for saying otherwise.  Despite assurances that had been made prior to the meeting, CEO Plaxico

would not permit Ms. Mullis to speak during the meeting.

68.

At that point, Ms. Mullis was so upset, she felt nauseous, and she asked to step out into the hall.

69.

After exiting briefly, Ms. Mullis reentered the room a couple of minutes later, still crying, but largely composed.

70.

CEO Plaxico demanded to know why Ms. Mullis had recorded the conversation.  Ms. Mullis immediately realized that she left her phone in the room when she stepped into the hall, and she had not first stopped recording.  Since the mobile device had been left face-down, the only way that CEO Plaxico would have known that Ms. Mullis was recording was that he or the HR Director had picked up and accessed Ms. Mullis' phone without permission.

71.

Regardless, CEO Plaxico told Ms. Mullis that her recording was illegal, and he threatened to press charges against her.  Ms. Mullis apologized for her oversight, and she even deleted, not just the recording, but the entire application she used for the recording from her device in full view of the CEO.

72.

This did not satisfy CEO Plaxico, and he told Ms. Mullis that she was fired and to leave the premises immediately.

73.

HR Director McKenzie then spoke up and warned CEO Plaxico that this was not a good

idea; however, the decision to terminate Ms. Mullis was later confirmed.

74.

Defendant later issued a Georgia Department of Labor Separation notice, which provided

Sunday, May 3, 2020 as the last day of Ms. Mullis' employment.

75.

When Ms. Mullis was terminated, Defendant was aware that Ms. Mullis was scheduled to

undergo magnetic resonance imaging ("MRI") testing on Monday, May 4, 2020.

76.

Defendant was also aware that Ms. Mullis and her medical providers expected that the MRI

would result in a formal diagnosis of Ms. Mullis' medical condition.

77.

Defendant knew at the time of Ms. Mullis' termination that the May 4, 2020 MRI would

likely inform the course of treatment needed to address her condition.

78.

At the time of the termination, Defendant knew that the results of the May 4, 2020 MRI

would result in the need for Ms. Mullis to get a reasonable accommodation and/or take a period of

leave for her treatment and recovery.

79.

At the time of Ms. Mullis' termination, Defendant was aware that Ms. Mullis would reach

her one-year anniversary in her most-recent position with Defendant on or about May 15, 2020.

80.

After Defendant terminated Ms. Mullis' employment attempted to pressure Ms. Mullis by

delaying the issuance of her Separation Notice, failing to provide the appropriate notice for

COBRA, and by continuing to threaten Ms. Mullis that it intended to pursue criminal charges because Ms. Mullis recorded the meeting.  Additionally, Defendant would not allow Ms. Mullis to return to its property to collect her personal belongings, including prescription medication, that Ms. Mullis had left when she was abruptly told to leave the property.

81.

Defendant also tried to get Ms. Mullis to sign a severance agreement.  According to the recitals of the proposed severance agreement, Defendant expressly accused Ms. Mullis of violating a criminal statute under Georgia law.  The proposed severance agreement suggests that Defendant would agree to refrain from pursuing such charges.

82.

However, the proposed severance agreement would have required Ms. Mullis to release Defendant from any and all claims she had arising out of her employment, including those brought under Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Family and Medical Leave Act, as well as claims concerning compensation during Ms. Mullis' employment.

83.

Ms. Mullis refused to sign the severance agreement.

Procedural/Administrative Background

84.

On or about May 15, 2020, Ms. Mullis submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on disability and sex.  The EEOC assigned Ms. Mullis Charge Number 410-2020-05584.

85.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings and investigation, and was represented by counsel at that time.

86.

The EEOC subsequently issued a Notice of Right to Sue, which Ms. Mullis received through counsel on August 5, 2022.

87.

Ms. Mullis has exhausted her administrative remedies as to her Charge of Discrimination and she is filing the instant action within ninety days of the EEOC's issuance, as well as Ms. Mullis's receipt, of the Notice of Right to Sue.

**COUNT I:**
**FAILURE TO PAY OVERTIME**
**IN VIOLATION OF THE FAIR LABOR STANDARDS ACT**

88.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

89.

Under the Fair Labor Standards Act, an employer must pay a rate of not less than one and one-half times an employee's regular rate for any time worked in excess of forty hours for any given workweek. *See* 29 U.S.C. § 201(a)(1).

90.

As alleged herein, Defendant and Plaintiff are covered, non-exempt employer and employee under the Fair Labor Standards act, respectively. *See* 29 U.S.C. § 201(a)(1).

91.

As alleged herein, Plaintiff frequently worked in excess of forty hours per workweek.

92.

Defendant was aware of the fact that Plaintiff worked in excess of forty hours per workweek.

93.

However, Defendant failed to compensate Plaintiff for any hours in excess of forty per workweek at the appropriate overtime rate.

94.

Additionally, Defendant was aware that Plaintiff was performing work that should have been compensated at the rate of overtime but was not because Defendant failed and refused to keep accurate records concerning work performed by Plaintiff outside of normal business hours.

95.

Defendant classified Plaintiff as being "exempt" from overtime, but after Plaintiff further inquired into her eligibility for overtime and expressed her belief that she was legally eligible, Defendant continued to consider Plaintiff exempt and did not provide such compensation at the rate of overtime, and Defendant failed to further investigate whether Plaintiff was indeed entitled to compensation at the overtime rate.

96.

Defendant's conduct, as alleged herein, constitutes failing to provide overtime pay in violation of the Fair Labor Standards Act.

97.

Plaintiff has been injured by Defendant's actions and is entitled to an award of unpaid overtime compensation and all other damages allowed under the Fair Labor Standards Act for the period preceding two years prior to the filing of her initial action civil action, as well as reasonable attorney's fees and costs of litigation to be paid by Defendant pursuant to 29 U.S.C. § 216(b), in an amount to be proven at trial.

98.

The evidence will reflect the fact that Defendant willfully violated the Fair Labor Standards Act when it failed to compensate Plaintiff at the appropriate rate of overtime, and thus, Plaintiff should be permitted to recover all damages listed in the preceding paragraph for the period of three years prior to the filing of this action.

99.

Moreover, Defendant has acted in bad faith and did not have reasonable grounds to believe that its actions were not a violation of the Fair Labor Standards Act.

100.

This Court should exercise its sound discretion to award liquidated damages pursuant to 29 U.S.C. § 260, and should award to Plaintiff said liquidated damages in an amount equal to an award for unpaid overtime compensation.

**COUNT II:**
**DISCRIMINATION BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

101.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

102.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's sex.  42 U.S.C. § 2000e-2(a).

103.

Plaintiff is considered in a protected class as her sex is female.

104.

As alleged herein, Plaintiff was qualified for the position that she held with Defendant and her performance was exemplary at all times.

105.

As alleged herein, in January 2020, Defendant suspended Plaintiff for a period of two days.

106.

The reasons that Defendant issued said suspension had nothing to do with Plaintiff's employment, her performance, or her conduct.

107.

Defendant suspended Plaintiff because she is female, she had recently ended her relationship with a man, and Defendant believed that the man was in North Macon at the time.

108.

As alleged herein, Plaintiff was treated less favorably than her coworkers who were not female and/or not women who had ended their relationship with a man.

109.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for suspending Plaintiff's employment for reasons unrelated to her conduct and performance and otherwise treating Plaintiff less favorably than her similarly situated counterparts.

110.

Plaintiff will prove that the Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's sex, which is evidenced, in part, by Defendant's previous threat to discipline Plaintiff solely because she was residing in the same household as a member of the opposite sex to whom Plaintiff was not yet married.

111.

Plaintiff has been injured by Defendant's discrimination against her based on sex, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, or other amount provided by statute, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## IMPROPER MEDICAL EXAMINATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT

112.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

113.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

114.

Additionally, the ADA prohibits employers from requiring a medical examination of an employee unless such examination is shown to be job-related and consistent with business activity. 42 U.S.C. ¶ 12112(d).

115.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

116.

As alleged herein, Plaintiff had been employed with Defendant on multiple occasions and she had been serving as Defendant's Director of Health and Wellness for nearly one year. Plaintiff had been performing her duties in that role and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation. Moreover, the evidence will reflect that Plaintiff's performance was not only satisfactory, but exemplary.

117.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

118.

Specifically, Plaintiff suffers from Osteosarcoma, a cancerous condition involving the bones, and a mass at the base of her skull that was suspected to be Polycythemia. These conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as her mobility, ability to perform physical tasks, communications with others, the ability to see,

tasks requiring memorization, and the ability to work at times.

119.

In or around February 2020, Defendant repeatedly advised Plaintiff that she should receive mental health services to the extent that it made Plaintiff believe that such counseling would be required in order for her to keep her job.  As a result, Plaintiff received the mental health counseling services that Defendant told her to get.

120.

Defendant's stated purpose for demanding such counseling was merely that Plaintiff had a lot on her plate at the time.

121.

Defendant's requirement for Plaintiff to receive mental health counseling had no relation to Plaintiff's job or her performance.

122.

Defendant's requirement for Plaintiff to receive mental health counseling was not consistent with any of Defendant's business activities.

123.

As a result, Defendant subjected Plaintiff to a prohibited mental health examination.

124.

Plaintiff has been injured by Defendant requiring her to undergo a prohibited medical examination, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT IV:**
**IMPROPER MEDICAL EXAMINATION IN VIOLATION OF**
**IN VIOLATION OF THE REHABILITATION ACT**

125.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

126.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

127.

Defendant, as a program receiving Federal financial assistance and grants, both directly and indirectly, from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

128.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

129.

For the reasons set forth in Count III, *supra*, Defendant subjected Plaintiff to a prohibited medical and mental health examination.

130.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

**COUNT V:**
**IMPROPER MEDICAL INQUIRIES IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**

131.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

132.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

133.

Additionally, the ADA prohibits employers from making inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of such disability unless such examination is shown to be job-related and consistent with business activity. 42 U.S.C. ¶ 12112(d).

134.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

135.

As alleged herein, Plaintiff had been employed with Defendant on multiple occasions and she had been serving as Defendant's Director of Health and Wellness for nearly one year. Plaintiff had been performing her duties in that role and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation. Moreover, the

evidence will reflect that Plaintiff's performance was not only satisfactory, but exemplary.

136.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

137.

Specifically, Plaintiff suffers from Osteosarcoma, a cancerous condition involving the bones, and a mass at the base of her skull that was suspected to be Polycythemia. These conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as her mobility, ability to perform physical tasks, communications with others, the ability to see, tasks requiring memorization, and the ability to work at times.

138.

In or around April 2020, after Plaintiff advised her supervisor that she would have to miss a day of work for an oncology appointment, Plaintiff's supervisor specifically scheduled a meeting to discuss Plaintiff's medical condition. During the April 28, 2020 meeting, Defendant subjected Plaintiff to numerous questions about her medical condition and disability, including when she would be working or need leave, what types of treatment Plaintiff would need, how long such treatment was expected to take, and what symptoms Plaintiff was experiencing as a result of her condition. Plaintiff's supervisor also required Plaintiff to provide much of this information to her subordinates and coworkers.

139.

Defendant did not have any valid basis for asking Plaintiff the aforementioned questions about her medical condition and disability.

140.

Defendant's questions about Plaintiff's medical condition and disability had no relation to Plaintiff's job or her performance.

141.

Defendant's questions about Plaintiff's medical condition and disability were not consistent with any of Defendant's business activities.

142.

As a result, Defendant subjected Plaintiff to a prohibited medical and mental health inquires.

143.

Plaintiff has been injured by Defendant's prohibited medical inquires, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT VI:**
**IMPROPER MEDICAL INQUIRIES IN VIOLATION OF**
**IN VIOLATION OF THE REHABILITATION ACT**

144.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

145.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

146.

Defendant, as a program receiving Federal financial assistance and grants, both directly and indirectly, from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

147.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

148.

For the reasons set forth in Count V, *supra*, Defendant subjected Plaintiff to prohibited medical inquiries.

149.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT VII:
## FAILURE TO PROVIDE REASONABLE ACCOMMODATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

150.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

151.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

152.

Discrimination based on disability includes an employer's failure to make a "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

153.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

154.

As alleged herein, Plaintiff had been employed with Defendant on multiple occasions and she had been serving as Defendant's Director of Health and Wellness for nearly one year.  Plaintiff had been performing her duties in that role and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation. Moreover, the evidence will reflect that Plaintiff's performance was not only satisfactory, but exemplary.

155.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

156.

Specifically, Plaintiff suffers from Osteosarcoma, a cancerous condition involving the bones, and a mass at the base of her skull that was suspected to be Polycythemia. These conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as her mobility, ability to perform physical tasks, communications with others, the ability to see, tasks requiring memorization, and the ability to work at times.

157.

Defendant was aware of Plaintiff's medical condition and disabilities, and in an April 28, 2020 meeting with its Chief Executive Officer, Plaintiff explained how her medical condition resulted in migraines, changes in her mood and unusual reactions to situations, and problems with her vision.

158.

During a telephone call on the following day, Defendant's Chief Executive Officer accused Plaintiff of yelling, overreacting, and acting unprofessionally.

159.

In a text message exchange immediately after said telephone call, Defendant's Chief Executive Officer made comments that made it clear that he believed that the conduct that he had perceived from Plaintiff had been the result of the medical condition and symptoms that had been discussed the prior day.

160.

On the day following the call, April 30, 2020, Defendant asked Plaintiff to come in for a meeting for the purpose of issuing her a written reprimand and two-day suspension for what had occurred during the April 29, 2020 telephone call.

161.

However, to the extent that Defendant perception concerning Plaintiff's conduct on the call was accurate, the need to provide Plaintiff with a reasonable accommodation for her disability was apparent. As a result, Defendant had a duty to initiate the interactive process and to provide Plaintiff with a reasonable accommodation for her disability.

162.

Defendant not only failed to initiate the interactive process or provide Plaintiff with a reasonable accommodation, Defendant disciplined Plaintiff for conduct that Defendant believed had been directly connected to Plaintiff's disability.

163.

Plaintiff has been injured by Defendant's discrimination based on disability due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT VIII:**
**FAILURE TO PROVIDE A REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE REHABILITATION ACT**

164.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

165.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

166.

Defendant, as a program receiving Federal financial assistance and grants, both directly and indirectly, from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

167.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

168.

For the reasons set forth in Count VII, *supra*, Defendant discriminated against Plaintiff based on disability due to its failure to provide a reasonable accommodation.

169.

Plaintiff has been injured by Defendant's discrimination due to its failure to provide a reasonable accommodation, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT IX:
## WRONGFUL TERMINATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT

170.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

171.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

172.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

173.

As alleged herein, Plaintiff had been employed with Defendant on multiple occasions and she had been serving as Defendant's Director of Health and Wellness for nearly one year. Plaintiff had been performing her duties in that role and was otherwise qualified and able to perform the essential functions of her job, with or without a reasonable accommodation. Moreover, the evidence will reflect that Plaintiff's performance was not only satisfactory, but exemplary.

174.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities.

175.

Specifically, Plaintiff suffers from Osteosarcoma, a cancerous condition involving the bones, and a mass at the base of her skull that was suspected to be Polycythemia. These conditions, individually and in the aggregate, substantially limit several major life activities for Plaintiff such as her mobility, ability to perform physical tasks, communications with others, the ability to see, tasks requiring memorization, and the ability to work at times.

176.

On or about April 30, 2020, Defendant terminated Plaintiff's employment as a direct result of her disability and reasons directly connected to Plaintiff's disability, including the symptoms that Plaintiff was experiencing, the medical treatment that Plaintiff would require, and the leave that Plaintiff would need in order to receive such treatment and recover from her condition.

177.

Plaintiff will prove that Defendant's stated reasons for terminating Plaintiff's employment are false and pretextual to hide its discriminatory animus based on disability.

178.

Plaintiff has been injured by Defendant's termination of Plaintiff due to her disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT X:**
**WRONGFUL TERMINATION**
**IN VIOLATION OF THE REHABILITATION ACT**

179.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

180.

The Rehabilitation Act of 1973 prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency…" 29 U.S.C. § 794(a).

181.

Defendant, as a program receiving Federal financial assistance and grants, both directly and indirectly, from the United States government, and Plaintiff, as an employee of Defendant, are a covered entity and individual, respectively, under the Rehabilitation Act.

182.

The Rehabilitation Act expressly incorporates the standards used in Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 794(d).

183.

For the reasons set forth in Count IX, *supra*, Defendant terminated Plaintiff's employment due to her disability.

184.

Plaintiff has been injured by Defendant's discrimination due to disability, and Plaintiff is entitled to all damages available under the Rehabilitation Act, in an amount to be proven at trial.

## COUNT XI:
## INTERFERENCE WITH RIGHTS
## UNDER THE FAMILY AND MEDICAL LEAVE ACT

185.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 87, as if the same were set forth herein.

186.

At all times relevant to this Complaint, Defendant was a covered, non-exempt employer pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq.

187.

As alleged herein, Plaintiff worked for a covered employer, had worked for the covered employer for at least twelve months, had at least 1,250 hours of service for the employer during the twelve-month period immediately preceding the requested leave, and worked at a location where the employer had at least 50 employees within 75 miles.

188.

Defendant was aware that Plaintiff suffered from several serious health conditions – specifically, Osteosarcoma and a mass at the base of her skull.

189.

In April 2020, Defendant became aware that Plaintiff would need to miss a partial day of work in order to see her oncologist.  On April 28, 2020, after Plaintiff's appointment with her oncologist, Defendant became aware that Plaintiff would need to undergo additional testing – particularly an MRI – in order to determine the specific nature of the mass at the base of Plaintiff's skull.  On the same day, Defendant also became aware that it would soon be likely that Plaintiff would need to take additional time off for additional testing, treatment, and recovery from her condition.

190.

At this time, Defendant was aware that Plaintiff was eligible to take leave under the Family and Medical Leave Act.

191.

Alternatively, at that time, Defendant was under the erroneous belief that Plaintiff would be eligible to take leave under the Family and Medical Leave Act beginning on May 15, 2020 – the anniversary of Plaintiff's most recent tenure working for Defendant.

192.

Defendant was aware that Plaintiff had an appointment on May 4, 2020, in which additional testing in the form of an MRI would determine the treatment that Plaintiff would need to address the medical conditions alleged herein.

193.

Defendant terminated Plaintiff's employment, effective on May 3, 2020, in an attempt to prevent Plaintiff from requesting or taking leave under the Family and Medical Leave Act.

194.

Pursuant to the Family and Medical Leave Act, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under this chapter." 29 U.S.C. § 2615(a)(1).

195.

Defendant engaged in prohibited conduct under the Family and Medical Leave Act by interfering with, restraining, and denying Plaintiff the rights and benefits she was otherwise entitled under the same.

196.

As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered injuries, including a loss of earnings, mental anguish, physical and emotional distress, humiliation and embarrassment, and the loss of professional reputation.

197.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i), Defendant is liable for damages equal to the amount of wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by reason of this violation, in an amount to be proven at trial.

198.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), due to Defendant's willful violation of the Act and reckless disregard of whether Defendant's conduct was prohibited, Defendant is liable for an additional amount as liquidated damages, equal to the sum of any award of damages under this Count in an amount to be proven at trial.

199.

Pursuant to 29 U.S.C. § 2617(a)(1)(A)(ii), Defendant is liable for interest on any award of damages under this Count in an amount to be proven at trial., calculated at the prevailing rate, and in an amount to be proven at trial.

200.

Pursuant to 29 U.S.C. § 2617(a)(1)(B), Defendant is liable for such equitable relief as may be appropriate, including reinstatement and promotion.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amber Mullis respectfully prays for the following relief:

1)   That Summons and Process be issued to Defendant Wesley Glen Ministries, Inc., and that said Defendant be served as provided by law;

2)   That this matter be tried before a jury;

3)   That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for Failure to Pay Overtime, and grant Plaintiff all relief allowable under the Fair Labor Standards Act;

4) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

5) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for discrimination based on disability, by way of subjecting Plaintiff to improper medical examination, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

6) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IV for discrimination based on disability, by way of subjecting Plaintiff to improper medical examination, and grant Plaintiff all relief allowable under the Rehabilitation Act;

7) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count V for discrimination based on disability, by way of subjecting Plaintiff to improper medical inquiries, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

8) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VI for discrimination based on disability, by way of subjecting Plaintiff to improper medical inquiries, and grant Plaintiff all relief allowable under the Rehabilitation Act;

9) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VII for discrimination based on disability, by way of failing to provide Plaintiff with a reasonable accommodation, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

10) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VIII for discrimination based on disability, by way of failing to provide Plaintiff with a reasonable accommodation, and grant Plaintiff all relief allowable under the Rehabilitation Act;

11) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IX for discrimination based on disability, by way of terminating Plaintiff's employment due to her disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

12) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count X for discrimination based on disability, by way of terminating Plaintiff's employment dye to her disability, and grant Plaintiff all relief allowable under the Rehabilitation Act;

13) That judgment be awarded for and in favor of Plaintiff and against Defendant on Count XI for interfering with Plaintiff's attempt to exercise her right to take leave by terminating her employment, and grant Plaintiff all relief allowable under the Family and Medical Leave Act; and,

14) For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 1st day of November, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com